UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____ x

AMY MAYO, on behalf of herself and all
others similarly situated,

     *Plaintiff,*

v.

GIRL SCOUTS OF THE UNITED STATES
OF AMERICA; FERRERO U.S.A., INC.; and
INTERBAKE FOODS, LLC d/b/a ABC
BAKERS,

     *Defendants.*

_____ x

Case No. _____

**<u>CLASS ACTION COMPLAINT</u>**

DEMAND FOR JURY TRIAL

Plaintiff Amy Mayo ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following class action complaint (the "Action") against Defendants Girl Scouts of the United States of America ("Girl Scouts"), Ferrero U.S.A., Inc. ("Ferrero"), and Interbake Foods, LLC d/b/a ABC Bakers ("ABC Bakers") (collectively, "Defendants") for violations of state statutes and common law doctrines seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees upon personal knowledge as to herself and her own actions, and upon information and belief, including the investigation of counsel as follows:

I.      INTRODUCTION

> "*The health and safety of Girl Scouts and cookie customers is our top priority.*
>
> *Rest assured: Girl Scout Cookies are safe to consume*."
>
> Girl Scout Cookies' Blog, February 6, 2025[1]

1.      Girl Scouts distributes a ubiquitous brand of boxed, ultra-processed cookies ("Girl Scout Cookies" or "Products") which are sold by Girl Scouts (who are primarily children) and are marketed to children and young adults.  Girl Scout's Girl Scout Cookies are sold around the United States and are baked, manufactured, and produced by Ferrero and ABC Bakers.

---

[1] https://blog.girlscouts.org/2025/02/an-important-update-for-our-members-and.html, (last accessed, Mar. 7, 2025).

2.     The tremendous success of Girl Scout's Girl Scout Cookies is unparalleled: the sale of these cookies alone can generate up to $1 billion on an annual basis.[2]  Each year, over 700,000 Girl Scouts participate in the sale of Girl Scout Cookies.[3]

3.     Girl Scout Cookies are only sold by members of the Girl Scouts.[4]  The reason that the Girl Scout Cookies are only sold by members of the Girl Scouts is to "provide[] opportunities to practice and develop entrepreneurial skills [… to] help[] Girl Scouts build a better future."[5] The way that Girl Scouts do this is by going to Defendants' websites to learn more about the Girl Scout Cookies that they sell and to collect marketing materials so that they can entice consumers to purchase them.

4.     Just a few of the representations that are made on Defendants' websites regarding Girl Scout Cookies includes:

   a.   Girl Scouts: "We trust our licensed bakers, who are industry leaders, to produce the best-tasting and highest-quality cookies[.]"[6]

   b.   Girl Scouts: "[Girl Scouts] is committed to providing customers with the highest quality products available."[7]

---

[2] Bill Chappell, "*My daughters sold Girl Scout Cookies. Here's what I learned in the Thin Mint trenches*," NATIONAL PUBLIC RADIO (ONLINE) (Feb. 29, 2024), at https://www.npr.org/2024/02/29/1234163657/girl-scout-cookies-thin-mints-how-it-works.

[3] *Id.*

[4] https://www.girlscouts.org/en/cookies/how-to-buy-cookies/cookies-frequently-asked-questions.html, (last accessed, Mar. 7, 2025).

[5] *Id.*

[6] *Id.*

[7] *Id.*

     c.    <u>Ferrero</u>: "The First in Top-Quality Ingredients."[8]

     d.    <u>ABC Bakers</u>: "Our bakery has written standards for each process and cookie variety, and we select the finest possible ingredients[.]"[9]

5.     However, despite these representations that Girl Scout Cookies are sold as being fit for consumption, are marketed to children, and are sold as part of a sophisticated operation that has the resources to ensure than the Girl Scout Cookies[10] are safe, Defendants instead produce and distribute Products which are contaminated with dangerous heavy metals, including aluminum, arsenic, cadmium, lead, and mercury (hereinafter, "Heavy Metals") and pesticides, including glyphosate (collectively, the "Toxins").[11]

6.     Extensive testing, which took place in the latter half of 2024, found that 100% of the Products contained at least four out of five Heavy Metals.[12]  For example, Thin Mints

---

[8] https://www.littlebrowniebakers.com/index.php/products/adventurefuls, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/samoas, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/dosidos, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/tagalongs, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/thinmints, (last accessed Mar. 7, 2025); and https://www.littlebrowniebakers.com/products/trefoils, (last accessed Mar. 7, 2025).

[9] https://www.abcbakers.com/faqs/, (last accessed Mar. 7, 2025).

[10] Including but not limited to: Toast-Yay, Lemonades, Peanut Butter Patties, Caramel Delites, Peanut Butter Sandwich, Adventurefuls, Adventurefuls (Indulgent Brownie), Thin Mints, Trefoils, S'mores, Lemon-Ups, Toffeetastic (Gluten Free), Do-si-dos, Samoas, and Tagalongs.

[11] Michelle Perro, MD, Stephanie Seneff, PhD, and Zen Honeycutt, BFA, "*Danger in the Dough: Unveiling the Toxic Contaminants in Girl Scout Cookies*," GMO Science (Online) (Dec. 27, 2024), at https://gmoscience.org/2024/12/27/danger-in-the-dough/.

[12] *Id.*

contained 334 times more glyphosate[13] than is commonly accepted by scientists in the field, 76%

of the Products tested positive for levels of cadmium which exceeded Environmental Protection

Agency ("EPA") limits in water, and 96% of the Products contained lead.[14]  A copy of the testing

conducted by New Jersey Laboratories Certified and by Health Research Institute shows that each

of the Products was tested – the results were extremely problematic.[15] To ensure the validity of

the testing and mitigate for confounding variables, samples of the Products were submitted from

boxes collected in different corners of the country, including from California, Iowa and Louisiana

– yet, the results were similar or the same.[16]

      7.     While the entire sales practice system for Girl Scout Cookies is built on a

foundation of ethics and teaching young girls sustainable business practices, Defendants failed to

uphold this standard themselves and failed as well to address the concerns raised in the laboratory

testing that took place.

      8.     On February 6, 2025, Girl Scouts released a blog post on its website, (included in

its entirely, *Supra* at ¶ 60), in an attempt to address the controversy that rightfully stemmed from

the laboratory results being picked up by various news outlets.[17]  The blog post fails to address

---

[13] Glyphosate has been linked to deleterious health effects including endocrine disruption, digestive issues, reproductive problems and neurotoxicity; similarly, cadmium and lead have been linked to cancer and neurological disorders.

[14] *Id.*  Currently, there is no safe level of consumption for lead.  *Id.*

[15] *See,* **Ex. A** – Certificate of Analysis – Heavy Metals, at https://gmoscience.org/wp-content/uploads/2025/01/GSC-HeavyMetalsReports.pdf, (last accessed Mar. 7, 2025).  *See,* **Ex. B** – Certificate of Analysis – Glyphosate, at https://gmoscience.org/wp-content/uploads/2025/01/COA-for-Glyphosate-Testing-Girl-Scout-Cookies-4-19-24.pdf, (last accessed Mar. 7, 2025).

[16] *Id.*

[17] "*An Important Update for Our Members and Supporters,*" GSBLOG (ONLINE) (Feb. 6, 2025), at https://blog.girlscouts.org/2025/02/an-important-update-for-our-members-and.html.

the testing itself or the necessity to recall the Products/ Rather, Girl Scouts doubles-down on its prior statements and declares: *"Girl Scout Cookies are made with ingredients that adhere to food safety standards set by the FDA and other relevant authorities."*[18]

9.     The science, however, says otherwise.

10.     Against this backdrop, Plaintiff Mayo, on behalf of herself and all others similarly situated, brings this Action seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state statutes and common law doctrines due to Defendants' acute failure to ensure that the Products were: (1) distributed, produced, and sold in a manner consistent with advertising, (2) fit and safe for their ordinary purpose which is to be consumed, (3) marketed free from omissions regarding the inclusion of Toxins in the Products.

11.     As a result of the foregoing, Plaintiff Mayo and Class members (defined below) were harmed by paying a price premium for the Products which they otherwise would not have paid due to the presence of Toxins – or would not have purchased the Products at all.

II.     JURISDICTION and VENUE

12.     *Subject Matter Jurisdiction.*  This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act of 2005 ("CAFA") because there are (a) more than 100 members of the proposed classes, (b) some members (including Plaintiff Mayo) of the proposed classes have a different domicile or citizenship from the Defendants, and (c) the claims of the proposed class members exceed $5 million, exclusive of costs and fees.  Specifically, there are thousands of members of the proposed classes – as nearly $1 billion worth of Products are sold annually across the country; Plaintiff Mayo is domiciled in New York while Defendants

---

[18] *Id.*

Ferrero and ABC Bakers are not; and the measure of damages (a price premium paid on every box of the Products during the Class Period) as alleged well exceeds $5 million dollars.

13.     *Personal Jurisdiction.*   This Court has personal jurisdiction over Defendants because: (1) Plaintiff Mayo is domiciled in New York and made her purchases in New York (and, therefore, was economically injured in New York), (2) Defendant Girl Scouts is headquartered in New York, and (3) all of the Defendants conduct significant business in New York such that they purposefully availed themselves of the privilege of doing business in New York.

14.     *Venue.*   Venue is proper in this Court because Defendants transact business within this District, Plaintiff Mayo is domiciled in this District, and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

III.     PARTIES

*Plaintiff Amy Mayo*

15.     Plaintiff Amy Mayo is domiciled in New York and resides in Bayside, Queens, New York.

16.     On numerous occasions during the Class Period, Plaintiff Mayo purchased the Products.  For example, on January 23, 2025, Plaintiff Mayo purchased three boxes of Girl Scout Cookies which were produced by Ferrero and ABC Bakers and which were distributed and sold into commerce by Girl Scouts.  These purchases included one box of Adventurefuls (produced by either Ferrero or ABC Bakers), Peanut Butter Paddies (produced by ABC Bakers) and Caramel deLites (produced by ABC Bakers).

17.     Further, independent testing verifies what GMOScience found – that there is the presence of Toxins in the Products. According to testing, these Products contained:

| **PRODUCT** | Arsenic | Lead | Cadmium | Mercury | Aluminum | Glyphosate |
|---|---|---|---|---|---|---|
| *Adventurefuls* | 3.95 parts per billion ("ppb") | 5.67 ppb | 13.8 ppb | 0.00729 ppb | 16.0 parts per million ("ppm") | 9.30 nanograms per gram ("ng/g") |
| *Peanut Butter Paddies* | 8.95 ppb | 23.3 ppb | 29.5 ppb | 0.754 ppb | 27.5 ppm | 11.27 ng/g |
| *Caramel deLites* | 2.20 ppb | 21.9 ppb | 9.00 ppb | not detected | 13.8 ppm | 25.43 ng/g |

18.     When Plaintiff Mayo, like the other members of the Class, purchased the Products, which were produced in the same facilities as the other Products at issue, she believed that she was purchasing quality and safe cookies consistent with Girl Scout's promise of ethical business practices and the representations published on Defendants' websites.  However, this was not the case.

19.     Had Defendants marketed their Products accurately and refrained from making these vital omissions regarding the presence of Toxins in their Products, Plaintiff Mayo would have been aware of this and would not have purchased the Products or would have paid substantially less for them.

*Defendant Girl Scouts of the USA*

20.     Defendant Girl Scouts is a non-profit organization headquartered in New York, New York.

21.     Approximately 25-30% of all of the proceeds of the sale of the Products goes to Girl Scouts' individual troop organizations.[19]

---

[19] Bill Chappell, "*My daughters sold Girl Scout Cookies. Here's what I learned in the Thin Mint trenches*," NATIONAL PUBLIC RADIO (ONLINE) (Feb. 29, 2024), at https://www.npr.org/2024/02/29/1234163657/girl-scout-cookies-thin-mints-how-it-works.

*Defendant Ferrero U.S.A., Inc.*

22.     Defendant Ferrero is a Parsippany, New Jersey-based corporation which services over 8,000 downstream sellers of food products in 26 states.[20]  Ferrero produces and sells a significant amount of Girl Scout Cookies through its "Little Brownie Bakers" subdivision.[21]

23.     Ferrero generated revenue of over 18.4 billion Euros during the financial year ending on August 31, 2024.[22]  Ferrero, initially formed in Italy, has had a significant presence in North America since 1969 with the launch of Tic Tac mints; in the time since, Ferrero has sold iconic brands such as Ferrero Rocher, Kinder, Nutella, Tic Tac, Butterfinger, and Crunch and has acquired key brands such as Keebler, Famous Amos, Mother's Cookies, and others.[23]

*Defendant Interbake Foods, LLC d/b/a ABC Bakers*

24.     Defendant ABC Bakers is a Richmond, Virginia-based limited liability company with a significant presence in the cookies' product market throughout the United States.[24]  ABC Bakers produces and sells a significant portion of Girl Scouts Cookies and is a subdivision of George Weston Limited, a massive Canadian public company which was founded in 1882.[25]

---

[20] https://www.ferrarofoods.com/, (last accessed Mar. 8, 2025).

[21] https://www.littlebrowniebakers.com, (last accessed Mar. 8, 2025).

[22] https://www.ferrero.com/int/en/about-us/key-figures, (last accessed Mar. 8, 2025).

[23] https://www.ferreronorthamerica.com/about-ferrero-in-north-america, (last accessed Mar. 8, 2025).

[24] https://www.bakingbusiness.com/directories/1316-baking-snack/listing/316-interbake-foods-llc, (last accessed Mar. 8, 2025).

[25] https://www.weston.ca, (last accessed Mar. 8, 2025).

25.     In the Fourth Quarter of 2024 alone, George Weston Limited's revenue exceeded $15 billion.[26]

IV.     FACTUAL ALLEGATIONS

*The Dangers of Ultra-Processed Foods and Toxins*

26.     The very first consciousness of the dangers of unregulated food production in the United States began in earnest in 1906, with Upton Sinclair's release of the novel, *The Jungle*.[27] Initially, *The Jungle* was intended to address and act as an expose for the harms and harsh conditions of industrialized labor in America – with a particular focus on the immigrant workers in Chicago's meatpacking plants – but it instead had the result of moving Congress to regulate food production.[28]

27.     According to the Library of Congress, Sinclair "witnessed and described the dangerous, unsanitary practices of slaughterhouses and meatpack[ing]," which ignited an uproar across the country.[29]  Quickly, Congress passed the Meat Inspection Act of 1906 which sought, for the first time, to regulate a subset of the "wild-west" of food production.[30]

28.     At the time, Sinclair told *Cosmopolitan* magazine in October 1906 that "I wished to frighten the country by a picture of what its industrial masters were doing to their victims; entirely by chance, I stumbled upon another discovery – what they were doing to the meat-supply

---

[26] https://www.weston.ca/investors/news-events/detail?CNWID=122648, (last accessed Mar. 8, 2025).

[27] https://www.visitthecapitol.gov/artifact/jungle-upton-sinclair-1906-0#:~:text=Upton%20Sinclair%3A%20Cleaning%20Up%20the,time%20to%20regulate%20food%20production., (last accessed Mar. 8, 2025).

[28] *Id.*

[29] *Id.*

[30] *Id.*

of the civilized world.  In other words, I aimed at the public's heart, and by accident I hit it in the stomach."[31]

29.     For the past century, Sinclair's discoveries have reared their head in every corner of the food industry – time and time again.

30.     According to the Johns Hopkins Bloomberg School of Public Health, "more than half of all calories consumed at home by adults in the U.S. come from ultra-processed foods."[32] Specifically, this means foods which contain little or no nutritional value.[33]  And, as a result of these cheap, poorly made foods, diabetes and obesity rates have skyrocketed in tandem with linkages to chronic, often-terminal health conditions such as cardiovascular disease and cancer.[34]

31.     Professor Barry Smith, a renowned expert on multisensory experiences related to eating who has worked at many food companies including with Defendant Ferrero, says that producers of ultra-processed food have, over time, become more interested in making food irresistible to the extent where consumers feel unable to stop eating.[35]

32.     Today, the goal of food producers who make ultra-processed food is not necessarily to make a healthy product – but to pump out as much addictive food as possible in

---

[31] *Id.*

[32] "*Ultraprocessed Foods Account for More than Half of Calories Consumed at Home*," JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH (ONLINE) (Dec. 10, 2024), at https://publichealth.jhu.edu/2024/ultraprocessed-foods-account-for-more-than-half-of-calories-consumed-at-home.

[33] *Id.*

[34] *Id.*

[35] Kim Schewitz, "*A scientist who used to advise ultra-processed food companies shares 2 surprising ways they make food irresistible*," BUSINESS INSIDER (ONLINE) (Jul. 25, 2024), at https://www.businessinsider.com/scientist-shares-how-companies-make-ultra-processed-foods-irresistible-2024-7.

order to enhance their bottom line. This means doing the bare minimum (and often failing to) stay complaint with FDA mandated food safety practices and protocols, as well as using a substantial amount of chemicals and potential contaminants to keep the up rates of production.

33. From farm to table, ultra-processed food producers expose crops to cancer causing toxicants (like pesticides and herbicides) and processed food to hazardous chemicals and biologically dangerous substances when packaging and sanitizing prepared foods.[36] Furthermore, at an even earlier stage – the production of raw ingredients – metals like lead, arsenic, cadmium and mercury can contaminate water, air and soil because of pollution.[37] According to Dr. Conrad Choiniere, Ph.D. of the FDA, "[t]he FDA actively monitors the levels of these metals because at high levels they can be toxic and present a unique danger to those who are most vulnerable: our children."[38]

34. Over time, the prevalence of lead has actually declined in the general food supply due to the enhanced, data-driven ability of food producers throughout the supply chain to detect and eliminate Heavy Metals in food inputs.[39] And, while the amount of lead in food has dropped off, the amount of Heavy Metals or toxic elements still occurs in higher levels where foods are produced in areas exposed to past industrial uses and pollution.[40]

---

[36] "*What Risks Do Workers Face in Food Manufacturing*," LIBERTY SAFETY: FOOD PROCESSING (ONLINE) (Nov. 1, 2021), at https://www.libertysafety.com/safety-blog/food-processing/what-risks-do-workers-face-in-food-manufacturing/.

[37] "*What FDA is Doing to Protect Consumers from Toxic Metals in Foods*," FOOD AND DRUG ADMINISTRATION (Apr. 20, 2018), at https://www.fda.gov/food/conversations-experts-food-topics/what-fda-doing-protect-consumers-toxic-metals-foods.

[38] *Id.*

[39] *Id.*

[40] *Id.*

35.     Currently there is no safe or FDA approved threshold level of lead fit for human consumption in food, the FDA limit on arsenic levels is set at 10 ppb for drinking water, the FDA limit on mercury levels is set at 2 ppb for drinking water, the Centers for Disease Control limit on aluminum is set at 0.2 mg/L for drinking water, and the FDA limit on pesticides like Glyphosate is set to 0.1 ppm for food items.[41][42][43][44][45]

36.     The harms reported on by Congress are as follows:

   a.   *Inorganic Arsenic.*   The risks of exposure to arsenic include "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[46]

---

[41] "*Lead in Food and Foodwares*, " FOOD AND DRUG ADMINISTRATION (Jan. 6, 2025), at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares.

[42] "*Arsenic in Food*," FOOD AND DRUG ADMINISTRATION (Mar. 5, 2024), at https://www.fda.gov/food/environmental-contaminants-food/arsenic-food.

[43] "*Mercury in Food*," FOOD AND DRUG ADMINISTRATION (Mar. 5, 2024), at https://www.fda.gov/food/environmental-contaminants-food/mercury-food.

[44] "*Aluminum: Public Health Statement*," CENTERS FOR DISEASE CONTROL, at https://www.atsdr.cdc.gov/toxprofiles/tp22-c1.pdf (last accessed Mar. 8, 2025).

[45] "*Questions and Answers on Glyphosate*," FOOD AND DRUG ADMINISTRATION (Mar. 5, 2024), at https://www.fda.gov/food/pesticides/questions-and-answers-glyphosate#:~:text=EPA%20has%20established%20tolerances%20for,parts%20per%20million%20(ppm).

[46] "*Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury*," UNITED STATES HOUSE OF REPRESENTATIVES: SUBCOMMITTEE ON ECONOMIC AND CONSUMER POLICY, COMMITTEE ON OVERSIGHT AND REFORM (Feb. 4, 2021), at https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

b. *Lead.* The risks of exposure to lead include behavioral issues, decreased cognitive performance, delayed puberty and reduced postnatal growth.[47] The cognitive effects in early childhood are severe in terms of developmental delays and appear to be permanent.[48]

c. *Cadmium.* The risks of exposure to cadmium are similarly concerning. Cadmium is associated with significant decreases in IQ as well as the proliferation of other psychological harms, including attention deficit disorder – for example, a 2018 study found that young boys exhibiting higher amounts of exposure to cadmium had seven fewer IQ points than those with less cadmium exposure.[49]

d. *Mercury.* The risks of exposure to mercury are also permanent and extremely harmful. According to Congress, higher mercury content in the blood of younger children (age 2 and 3) were "associated with autistic behaviors" in that respective age group.[50]

37. Congress also has examined and proved that it is possible for food processors to manufacture consumable goods to avoid including lead in their products emphasizing that it is entirely possible that producers of candy products and chocolate-containing products source their raw materials appropriately so that lead levels in finished products do not exceed maximum threshold amounts.[51]

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

38.     As discussed, these Toxins are highly dangerous, especially to children. According to a study reported on by Congress, "a recent study estimates that exposure to environmental chemicals, including lead, are associated with [a] 40,131,518 total IQ points loss in 25.5 million children (or, roughly 1.57 lost IQ points per child) – more than the IQ losses associated with preterm birth, brain tumors and traumatic brain injury combined.  For every one IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000."[52]

39.     The FDA has declared that "arsenic, lead, cadmium and mercury are dangerous, particularly to infants and children.  They have 'no established health benefit' and [can] 'lead to illness, impairment, and in high doses, death.'"[53]

40.     These Toxins find their way into the food supply though a failure to monitor and eliminate them.  The deleterious effects of these Toxins are dangerous and harsh, as many are carcinogenic and can lead to other negative health impacts, like neurotoxicity and cardiovascular disease.[54]  And, with respect to food products sold into commerce that contain these Toxins (especially Heavy Metals like lead), they are even more unfit for consumption by vulnerable children.[55]

---

[52] *Id.*

[53] *Id.*

[54] Michelle Perro, MD, Stephanie Seneff, PhD, and Zen Honeycutt, BFA, "*Danger in the Dough: Unveiling the Toxic Contaminants in Girl Scout Cookies*," GMO SCIENCE (ONLINE) (Dec. 27, 2024), at https://gmoscience.org/2024/12/27/danger-in-the-dough/.

[55] "*Lead in Food and Foodwares*, " FOOD AND DRUG ADMINISTRATION (Jan. 6, 2025), at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares.

41.     Indeed, according to a 2021 report by Congress regarding the presence of Heavy Metals in various baby foods: "even low levels of exposure can cause serious and often irreversible damage to brain development.[56]  By way of the report, Congress explains:

> Exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity and increased risk of future criminal and antisocial behavior in children.  Toxic heavy metals endanger infant neurological development and long-term brain function.[57]

42.     According to Congress: "Baby food manufacturers hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe."[58]  The same holds true for Girl Scout Cookies – which are also marketed toward consumption by children.

43.     While the work of Upton Sinclair may have had its peak cultural significance during the turn of the 20th century, the same practices related to cost-cutting, failures to monitor, sanitation issues, and exposure to dangerous elements holds true over 100 years after *The Jungle* was published.

*The Girl Scout Cookies' Juggernaut*

44.     The Girl Scouts were formed in Savannah, Georgia in 1912 by Juliette Gordon Law with the purpose of empowering younger girls to reach their fullest potential.[59]  Beginning

---

[56] "*Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury*," UNITED STATES HOUSE OF REPRESENTATIVES: SUBCOMMITTEE ON ECONOMIC AND CONSUMER POLICY, COMMITTEE ON OVERSIGHT AND REFORM (Feb. 4, 2021), at https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

[57] *Id.*

[58] *Id.*

[59] *Id.*

in 1917, a Girl Scouts group from Muskogee, Oklahoma sold the first Girl Scout Cookies – as part of a broader effort to help raise money for local troop activities.[60]

45. In the mid-1930's, the sale of Girl Scout Cookies had become so successful that commercial bakers were hired to help the Girl Scouts meet consumer demand.[61]

46. Over time, Girl Scout Cookies have not only become a juggernaut for fundraising for the Girl Scouts' organization and local troops but generate nearly $1 billion worth of sales on an annual basis.[62] As a result, Girl Scout Cookies have become a ubiquitous, tremendously popular dessert – which is marketed as being good for the development of the girls who participate in the Girl Scouts program.

47. Collectively, the Girl Scouts' Girl Scouts Cookie sales program has not only made the individual troops millions of dollars but has put hundreds of millions of dollars into the pockets of the commercial bakers – like Ferrero and ABC Bakers – in the process.

48. As such, Girl Scouts, Ferrero, and ABC Bakers have all the financial, technological, and practical resources in the world to ensure that the Products they produce, market, and sell are safe and fit for consumption by children.

49. Girl Scout Cookies are sold into commerce (and into the hands of children) from Girl Scouts' members – who are also children. The Girl Scouts (and its parents) are told to rely upon online materials and marketing in order to sell Products to consumers. Defendants make a slew of representations regarding the quality and safety of the Products:

---

[60] *Id.*

[61] *Id.*

[62] Bill Chappell, "*My daughters sold Girl Scout Cookies. Here's what I learned in the Thin Mint trenches*," NATIONAL PUBLIC RADIO (ONLINE) (Feb. 29, 2024), at https://www.npr.org/2024/02/29/1234163657/girl-scout-cookies-thin-mints-how-it-works.

50.     As previously stated, these representations  on Defendants' websites regarding Girl Scout Cookies include:

a.  <u>Girl Scouts</u>: "We trust our licensed bakers, who are industry leaders, to produce the best-tasting and highest-quality cookies[.]"[63]

b.  <u>Girl Scouts</u>: "[Girl Scouts] is committed to providing customers with the highest quality products available."[64]

c.  <u>Ferrero</u>: "The First in Top-Quality Ingredients."[65]

d.  <u>ABC Bakers</u>: "Our bakery has written standards for each process and cookie variety, and we select the finest possible ingredients[.]"[66]

51.     Despite these representations, Defendants instead produce and distribute Products which are contaminated with Heavy Metals and Toxins.

52.     Further, Girl Scout Cookies are heavily marketed toward children.  With colorful designs, fun product names and the fact that Girl Scout Cookies are literally sold by children themselves, Girl Scouts know that its target demographic for consumption is children.  Parents who buy the Products are under the impression that Girl Scouts, a non-profit organization which

---

[63] *Id.*

[64] *Id.*

[65] https://www.littlebrowniebakers.com/index.php/products/adventurefuls, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/samoas, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/dosidos, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/tagalongs, (last accessed Mar. 7, 2025); https://www.littlebrowniebakers.com/index.php/products/thinmints, (last accessed Mar. 7, 2025); and https://www.littlebrowniebakers.com/products/trefoils, (last accessed Mar. 7, 2025).

[66] https://www.abcbakers.com/faqs/, (last accessed Mar. 7, 2025).

is supposed to uphold and teach business ethics to children, would only sell Girl Scout Cookies to be consumed by children if it knew that the Products were safe for consumption.

*Defendants' Products Contain Dangerous Toxins*

53.     In December of 2024, GMOScience released a well-sourced report regarding the presence of Toxins in Girl Scout Cookies.[67]   The report discusses how GMOScience, Moms Across America, and others commissioned glyphosate and heavy metal testing of Girl Scout Cookies.[68]  The testing was conducted on 13 different types of Girl Scout Cookies collected in the middle-to-latter portions of 2024 from California, Iowa, and Louisiana.[69]

54.     Ultimately, the testing yielded highly concerning results:

a.   100% of the samples tested were positive for glyphosate;

b.   100% of the samples were positive for toxic metals;

c.   96% of the samples were positive for lead; and

d.   88% of the samples tested positive for all five toxic metals (aluminum, arsenic, cadmium, lead, and mercury). [70]

55.     After the testing was completed (and before releasing the results of the testing), the groups which commissioned the testing reached out to Girl Scouts in order to discuss the findings but never received any sort of response.[71]  .

---

[67] Michelle Perro, MD, Stephanie Seneff, PhD, and Zen Honeycutt, BFA, "*Danger in the Dough: Unveiling the Toxic Contaminants in Girl Scout Cookies*," GMO SCIENCE (ONLINE) (Dec. 27, 2024), at https://gmoscience.org/2024/12/27/danger-in-the-dough/.

[68] *Id.*

[69] *Id.*

[70] The results of the testing can be found in Exhibits A and B attached hereto.

[71] *Id.*

56.     According to GMOScience:

Our concerns are about the potential toxic contaminants that are not intended or listed as ingredients, but substances that inadvertently got into the cookies either through unsafe farming practices or during processing… We felt that our results were alarming, and they raised larger concerns about the safety of many other brands of cookies that are likely manufactured using similar practices.

The health implications of toxic substances in cookies extend beyond the immediate impact on our girls and affect the public at large.  Identifying and eliminating the sources of these toxic metals is imperative to safeguarding public health.[72]

57.     GMOScience further stated that:

The responsible thing to do by the Girl Scouts is to have their own cookies tested and demonstrate that indeed we were incorrect in the analysis.  We did reach out to the Girl Scouts several times prior to publication without any response.[73]

58.     According to GMOScience, "[n]otably, all those involved in this research effort were former Girl Scouts, making this initiative not just a scientific endeavor, but a deeply personal one as well."[74]

### Defendants Deny and Obfuscate the Testing Results, Compounding Harm

59.     After the results of GMOScience's testing of Girl Scout Cookies, a slew of news articles and other reporting amplified GMOScience's grave concerns about the presence of Toxins in Girl Scout Cookies.

60.     However, rather than pull the Products from shelves and ensure that Girl Scout Cookies are safe for consumption, Girl Scouts did the opposite.  On February 6, 2025, Girl Scouts released the following blog post on its website, (blog.girlscouts.org):

---

[72] Michelle Perro, MD, Stephanie Seneff, PhD, and Zen Honeycutt, BFA, "*Danger in the Dough: Unveiling the Toxic Contaminants in Girl Scout Cookies*," GMO SCIENCE (ONLINE) (Dec. 27, 2024), at https://gmoscience.org/2024/12/27/danger-in-the-dough/.

[73] *Id.*

[74] *Id.*

## AN IMPORTANT UPDATE FOR OUR MEMBERS AND SUPPORTERS

For over 100 years, Girl Scouts of the USA has been dedicated to building girls of courage, confidence, and character, who make the world a better place. An important part of this mission is the iconic Girl Scout Cookie Program, which is the largest girl-led entrepreneurial program in the world. The cookie program teaches valuable life skills like goal setting, decision making, people skills, money management, and business ethics ensuring that girls can become leaders in their communities.

**The health and safety of Girl Scouts and cookie customers is our top priority. Rest assured: Girl Scout Cookies are safe to consume.**

A recent report claimed that our Girl Scout Cookies contain certain levels of glyphosate and heavy metals. We want to address these allegations and share the facts:

**Girl Scout Cookies are made with ingredients that adhere to food safety standards set by the FDA and other relevant authorities.**
- Our trusted bakers remain committed to compliance with all food safety standards and regulations set forth by the U.S. Food and Drug Administration (FDA), the Environmental Protection Agency (EPA), and other relevant health authorities.
- These standards ensure that food products are safe for consumption.
- As a result, Girl Scout Cookies are safe to consume and are manufactured in accordance with all food safety regulations.

**To further put the coverage in proper context:**
- Environmental contaminants—which can include heavy metals—can occur naturally in soil. This means that nearly all foods using plant-based ingredients, including organic foods, may contain trace amounts. This does not mean that these foods are harmful to consume.
- Glyphosate is widely used in agriculture in accordance with established EPA standards and is found nearly everywhere in the food chain. Trace amounts of glyphosate can be found in fresh fruits, vegetables, cereals, baked goods, and other food and beverage commodities.
- Similarly, small amounts of heavy metals can be found naturally in the environment, including in food products, due to air, water, and soil exposure.

- These metals are not added to our Girl Scout Cookies.
- While such occurrences are not unique to Girl Scout Cookies, our trusted baking partners continue to ensure the integrity of our recipes and the safety of all Girl Scout Cookie products in accordance with federal regulations and Global Food Safety initiative standards.
- Our bakers have confirmed that the levels reported do not pose a food safety concern to our customers.

The Girl Scout Cookie Program is about more than a sweet treat. It teaches Girl Scouts to think critically, build confidence, and use the skills of entrepreneurship, leadership, and business ethics in the real world. And remember: every purchase of Girl Scout Cookies powers life-changing experiences for Girl Scouts right in your local community. Visit girlscoutcookies.org to support a troop in your area.[75]

61.    Similarly, Girl Scouts released a policy document including literature for Girl Scouts to use to address these concerns when selling the Products.  This literature echoed the exact same points that were made in the above blog post.[76]

62.    These responses to GMOScience's testing are woefully inadequate.

63.    *First*, Girls Scout's response attributes the presence of glyphosate to the fact that it "is widely used in agriculture" and that the presence of Heavy Metals are "found naturally in the environment" but takes zero responsibility for the fact that Defendants have failed to monitor and remove these Toxins from their food products regardless of the fact that they are widely used. Just because various toxicants can be found across the food chain does not mean they are safe –

[75] "*An Important Update for Our Members and Supporters*," GSBLOG (ONLINE) (Feb. 6, 2025), at https://blog.girlscouts.org/2025/02/an-important-update-for-our-members-and.html.

[76] "*Navigating Questions about the Presence of Metals and Glyphosate in Girl Scout Cookies*," GIRL SCOUTS OF U.S.A. (ONLINE), at https://www.gseok.org/content/dam/gseok-redesign/documents/cookies/2025/TroopResource_Cookieingredients.pdf (last accessed Mar. 9, 2025).

and by saying that they are found commonly does not account for the fact that they are dangerous and have been proven so numerous times.

64.     *Next*, Girl Scouts state "[t]hese metals are not added to our Girl Scout Cookies." This statement too is highly problematic. Whether Girl Scouts consciously placed Heavy Metals into its Products or not is irrelevant to the fact that Heavy Metals are present in its cookies and the testing is proof positive.

65.     *Finally*, Girl Scouts reiterate numerous times that the levels of Toxins are either fine or that "Girl Scout Cookies are safe to consume." However, this is also not true. If the testing is to be believed (and the testing is not refuted by Girl Scouts), then the Products contain Toxins which should not be present. For example, lead was found in 100% of samples tested – and there is no safe level of consumption for lead.

66.     Furthermore, even Congress has stated that it is entirely possible to weed out the presence of these Toxins from sugar-based and chocolate covered products – like the Products at issue.[77] Girl Scouts, however, chooses not to weed out the presence of the Toxins even when faced with the testing presented to them by GMOScience in December of 2024.

<u>*Harm to Consumers*</u>

67.     Due to the significant amount of sales of the Products, there are thousands (if not millions) of consumers who have purchased and are continuing to purchase Girl Scout Cookies produced and sold by the Defendants.

---

[77] "*Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury*," UNITED STATES HOUSE OF REPRESENTATIVES: SUBCOMMITTEE ON ECONOMIC AND CONSUMER POLICY, COMMITTEE ON OVERSIGHT AND REFORM (Feb. 4, 2021), at https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

68.     Given the deleterious health impacts and risks of toxicants on child development and on both the health of children and adults, the presence of these Toxins in the Products is a material fact to reasonable consumers, including Plaintiff and Class members.

69.     The testing conducted and made publicly available by GMOScience put Defendants on notice of the presence of these Toxins in the Products as early as December of 2024, if not sooner.

70.     Furthermore, Defendants knew or should have known of the presence of these Toxins in the Products through routine monitoring and testing – and yet, the Products still tested positively for them.

71.     There has also been a slew of litigation regarding these types of allegations with respect to other food products – including in baby food, in chocolate products, and other ultra-processed foods.

72.     All of this should have put the Defendants on both actual and constructive notice for the need to test for these Toxins and to eliminate them to their children-centric Products.

73.     Food manufacturers, especially sophisticated ones like Defendants, hold a position of public trust.  Consumers, like Plaintiffs and Class members, reasonably believe that these Products would not be sold if Defendants had reason to believe that the Products are contaminated with unsafe levels of Heavy Metals.  And yet – they continue to be sold to this very day.

74.     In light of all of this, had Plaintiff and Class members known that the Products contained (or risked containing) Toxins, they either would have been unwilling to purchase the Products or would have paid less for the Products.

75.     Defendants knew or should have known that Plaintiff and Class members would rely on Defendants' representations to the contrary, to the packaging marketed toward children,

and to the relationship between a consumer and a food producer to adequately make consumers aware of this concerning set of facts. The Products' labels are materially deceptive, false and misleading given Defendants' omissions about the presence (or risk) of Heavy Metals and Toxins as described above.

76. Had Plaintiff and Class members known the truth, they would not have been willing to purchase these Products or would have paid substantially less for them.

77. As such, Plaintiff and Class members were harmed in the form of the monies they paid for the Products which they would not have otherwise paid had they known the truth. Since the presence (or risk) of Heavy Metals and Toxins in the Products renders them unsafe for human consumption, the Products that Plaintiff and Class members purchased are worthless or are worth less than what Plaintiff and Class members paid for them.

*Federal Rule of Civil Procedure 9(b) Allegations*

78. Rule 9(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P. 9(b)") provides that "[i]n alleging fraud or a mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, and as detailed both above and below, Plaintiff has satisfied the requirements of Fed. R. Civ. P. 9(b) by establishing the following elements with sufficient particularity:

79. <u>WHO</u>: Defendants made (and continue to make) material omissions of fact in packaging and marketing materials of the Products by omitting the presence (and/or risk) of significant amounts of unsafe Toxins, including glyphosate and Heavy Metals.

80. <u>WHAT</u>: Defendants' conduct was and continues to be fraudulent and deceptive because it has the overarching effect of deceiving consumers into believing that the Products do not contain (or risk containing) significant amounts of Toxins. Defendants omitted this crucial,

material fact from packaging and marketing materials with the knowledge that these issues are important to reasonable consumers and impacts consumers' purchasing decisions.

81.    <u>WHEN</u>:  Defendants omitted from the Products' labeling the fact that the Products contain (or risk containing) significant amounts of Toxins, continuing through the present day and during the applicable relevant periods, including at the point of sale.

82.    <u>WHERE</u>:  Defendants' omissions were made on the front labeling and packaging of the Products, in marketing materials provided to the Girl Scouts themselves, and on Defendants' websites – which all purport to use the finest possible ingredients.  As discussed in this Complaint, Plaintiff and Class members read and relied on Defendants' omissions before purchasing the Products.

83.    <u>WHY</u>:  Defendants omitted from the Products' labels, packaging and marketing materials the fact that they contain (or risk containing) Toxins for the express purpose of inducing Plaintiff and Class members to purchase the Products at a substantial price premium or more than they would have paid if they had known the truth about the Products.  As such, Plaintiff profited by selling the Products to millions of consumers across the country, including to Plaintiff and Class members.

84.    <u>HOW</u>: Defendants omitted from the Products' labeling the fact that they contain (or risk containing) Toxins.

V.    CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this Action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

**Nationwide Class**: All persons within the United States who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

86.     Additionally, Plaintiff brings this Action on behalf of the following subclass:

**New York State Sub-Class**: All persons within the State of New York who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

87.     Excluded from the proposed Class are Defendants and any such entities in which the Defendants have a controlling interest, the Defendants' agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

88.     *Numerosity.*  The members of the Class are so numerous that joinder would be inefficient and impracticable.  Based upon Defednants' annual sales statistics, there are millions of Class members across the country.

89.     *Commonality.*  There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members.  These common questions of law and fact include, without limitation:

     i.   Whether Defendants violated state and common law statutes and doctrines;

     ii.   Whether Defendants engaged in the conduct as alleged;

     iii.   Whether Defendants were unjustly enriched;

     iv.   Whether Plaintiff was harmed;

     v.   The measure of damages to Plaintiff and Class members; and,

     vi.   Whether Plaintiff is entitled to declaratory and injunctive relief.

90.    *Typicality.*  Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, such that there are no defenses unique to Plaintiff.  The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

91.    *Adequacy of Representation.*  Plaintiff will fairly and adequately represent and protect the interests of the Class members in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in class action litigation, and Plaintiff intends to prosecute her action vigorously.

92.    *Superiority of Class Action.*  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

93.    The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class

members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

94.     Adequate notice can be given to Class members directly using information maintained in the parties' records.

95.     *Predominance.*  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

96.     This proposed class action does not present any unique management difficulties.

<u>FIRST CAUSE OF ACTION</u>

VIOLATIONS OF CONSUMER PROTECTION LAWS

NEW YORK GEN. BUS. LAW § 349 ("GBL 349")

(ON BEHALF OF THE NATIONWIDE CLASS AND NEW YORK SUBCLASS)

AGAINST ALL DEFENDANTS

97.     Plaintiff repeats the allegations in Paragraphs 1-96 as if fully set forth with the same force herein.

98.     For purposes of GBL 349, Defendants are considered a business and Plaintiff (as well as Class members) are considered consumers.

99.     GBL 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service [. . .]"

100.    Defendants committed deceptive acts or practices by employing false, misleading, and deceptive representations and/or omissions about the presence (or risk of a presence) of Toxins in the Products.

101.     Information as to the content – and, specifically, the presence of Toxins – in each of their Products was in the exclusive control of Defendants.  Plaintiff could not possibly have known that the Products contained Toxins (and the risks that follow) because such information was not available to the public until December of 2024, and then was essentially denied by Girls Scouts in its February 2025 blog post and marketing materials.

102.     Because Plaintiff bought these Products numerous times, Plaintiff has standing to pursue this claim because she has suffered an economic injury due to lost money or property as a result of Defendants' acts or practices.  When Plaintiff purchased the Products, she relied on false, misleading and deceptive representations that the Products were fit for human consumption and did not contain elevated levels of Toxins.  Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendants' Products.

103.     Defendants' conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations.  Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – believe that they were safe to regularly consume.

104.     Defendants know that this health information about its Products, which are specifically marketed toward children, are material to consumers.  As a result of its deceptive acts and practices, Defendants sold millions of boxes of Girl Scout Cookies to unsuspecting consumers nationwide, as well as to thousands of unsuspecting consumers in New York.

105.     As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and

marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the presence of Toxins in them.

106.    On behalf of herself and Class members, Plaintiff seeks to enjoin Defendants' unlawful acts and practices.    On behalf of herself and Class members, Plaintiff also seeks to recover her actual damages or $50.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

<u>SECOND CAUSE OF ACTION</u>

VIOLATIONS OF CONSUMER PROTECTION LAWS

NEW YORK GEN. BUS. LAW § 350 ("GBL 350")

(ON BEHALF OF THE NATIONWIDE CLASS AND NEW YORK SUBCLASS)

AGAINST ALL DEFENDANTS

107.    Plaintiff repeats the allegations in Paragraphs 1-96 as if fully set forth with the same force herein.

108.    Defendants engaged in a campaign of false and misleading advertising and marketing with regard to the safety and Toxin content of its Products to deceive consumers into believing that the Products were safe for human consumption and did not contain high levels of Toxins.

109.    Because Plaintiff bought these Products numerous times, Plaintiff has standing to pursue this claim because she has suffered an economic injury due to lost money or property as a result of Defendants' acts or practices.  When Plaintiff purchased the Products, she relied on false, misleading and deceptive representations that the Products were fit for human consumption and did not contain elevated levels of Toxins.  Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendants' Products.

110. Defendants' conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations. Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – believe that they were safe to regularly consume.

111. Defendants know that this health information about its Products, which are specifically marketed toward children, are material to consumers. As a result of its deceptive acts and practices, Defendants sold millions of boxes of Girl Scout Cookies to unsuspecting consumers nationwide, as well as to thousands of unsuspecting consumers in New York.

112. As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the presence of Toxins in them.

113. On behalf of herself and Class members, Plaintiff seeks to enjoin Defendants' unlawful acts and practices. On behalf of herself and Class members, Plaintiff also seeks to recover her actual damages or $500.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

<u>THIRD CAUSE OF ACTION</u>

UNJUST ENRICHMENT/QUASI-CONTRACT

(ON BEHALF OF THE NATIONWIDE CLASS AND NEW YORK SUBCLASS)

AGAINST FERRERO AND ABC BAKERS

114.     Plaintiff repeats the allegations in Paragraphs 1-96 as if fully set forth with the same force herein.

115.     Plaintiff and Class members conferred a benefit onto Ferrero and ABC Bakers in the form of gross revenues derived from the sale of the Products as a result of the money paid by Plaintiff and Class members to Girl Scouts (and then paid to (or given to) Ferrero and ABC Bakers).

116.     Defendants Ferrero and ABC Bakers were unjustly enriched in retaining these gross revenues derived from Plaintiff and Class members, and retention of such revenues under these circumstances is unjust and inequitable because Ferrero and ABC Bakers omitted that the Products contained (or risked containing) Toxins.

117.     This caused economic injuries to Plaintiff and Class members because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

118.     Defendants Ferrero and ABC Bakers accepted and retained the benefit in the amount of gross revenues it derived from sales of the Products to Plaintiff and Class members – and it would be unjust for these Defendants to retain these financial benefits – and these profits should be placed into a constructive trust and disgorged to Plaintiff and Class members and restitution should be provided for Plaintiff and Class members.

## VI.     REQUEST FOR RELIEF

119.     Plaintiff, on her own behalf and on behalf of the Class and the Sub-Class, prays for the following relief:

a.   An order certifying the Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class and Sub-Class Representative and their attorneys as Class Counsel;

b.   A declaration that Defendants are financially responsible for notifying Class and Sub-Class members of the pendency of this suit;

c.   An order declaring that Defendants' conduct violates the consumer protection statutes cited;

d.   Actual damages;

e.   Statutory damages;

f.   An order providing appropriate equitable relief in the form of an injunction against Defendants' unlawful and deceptive acts and practices, and requiring proper, complete, and accurate representation and labeling of Girl Scout Cookies' products;

g.   Restitution for members of the Class and Sub-Classes to recover Defendants' ill-gotten benefits;

h.   A disgorgement of profits earned on the products sold as well as a disgorgement of the profits earned on the premiums charged to the Class and the Sub-Classes;

i.   Pre- and post- judgment interest on all amounts awarded;

j.   Other injunctive relief as the Court may deem appropriate; and

    k.   An order awarding Plaintiff and the Class and Sub-Classes their reasonable attorneys' fees and expenses and costs of suit.

VII.    JURY TRIAL DEMAND

120.    Plaintiff hereby demands a trial by jury.


DATED: March 10, 2025                    Respectfully submitted,

*/s/ Blake Hunter Yagman*

Jeffrey K. Brown
Blake Hunter Yagman
  LEEDS BROWN LAW, P.C.
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel.: (516) 873-9550
*jbrown@leedsbrownlaw.com*
*byagman@leedsbrownlaw.com*

*Attorneys for Plaintiff Mayo and*
*the Proposed Class*
